**In re S & R SERVICE, INC., Sunshine Services, Inc., Discount Leasing Corporation.**

**Robert J. SIEDLECKI, Plaintiff.**

v.

**Richard A. CASALE, et al., Defendants.**

**Bankruptcy No. 82–02261–BKC–JAG.**

**Adv. No. 82–1136–BKC–JAG–A.**

United States Bankruptcy Court,
S.D. of Florida.

Jan. 19, 1983.

Philip E. Morgaman, Fort Lauderdale, Fla., for Richard A. Casale and S & R Service, Inc.

Lawrence M. Weiner, North Miami Beach, Fla., for Robert J. Siedlecki.

FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This proceeding was commenced by an adversary complaint to lift stay filed against Richard A. Casale, which was amended to join the debtors as co-defendants. The debtors in the consolidated bankruptcy case are three related companies, S & R Service, Inc., Sunshine Services, Inc., and Discount Leasing Corporation. The three corporations together are in the business of operating a taxicab service, although S & R is the primary corporation. The three will be referred to collectively as "Debtor" or as "S & R". Richard A. Casale

is presently the one-hundred percent shareholder of all three corporations.

Plaintiff seeks a lifting of the stay so he may continue with proceedings in state court to complete a purchase and sale agreement made with the state court receiver of S & R Services. Debtor filed in the main case a motion to reject this same contract, and hearing on debtor's motion was had simultaneously with the trial of this adversary complaint. Plaintiff argues that the bankruptcy proceeding was brought in bad faith with regard to plaintiff's contract, and that that is sufficient legal basis to lift the stay. Defendant concedes that bad faith can be a "cause" for lifting the stay under 11 U.S.C. § 362(d)(1) but does not concede that bad faith existed here. Plaintiff did not cite any case law or statutory authority throughout the case and debtor did not cite any other authority as to the adversary proceeding.

Many witnesses testified, some in direct contradiction of each other. It was evident that this court has become the forum for a power struggle between operators of taxicab fleets in Broward County, Florida. The real complaint underlying all plaintiff's assertions is that the intent of Casale during the period in question was to do whatever was necessary, including putting the debtor into bankruptcy, in order to make debtors' taxi permits available to Jessie Gaddis, the largest operator of taxis in Broward County. Casale, on the other hand, contends that his state court actions were brought so that he could regain control of his companies; that the state court receiver which was intended to be for his (Casale's) protection improperly tried to sell the corporate assets to Siedlecki; and that the only "ulterior" motive in the bankruptcy proceeding was to protect his (Casale's) position in the corporations once the state court proceedings got out of hand. Each individual argues that the corporate creditors will be paid in full if he obtains the assets and that the creditors will be harmed if the other gains control. The detailed facts are as follows.

Casale was originally a fifty percent shareholder of the debtor corporations and one Steven Kaplan was the other shareholder. Disagreements between the two shareholders over control led to litigation in Broward County Circuit Court in which Casale obtained a judgment against Kaplan. The first litigation did not resolve all difficulties and Casale therefore filed another action against the corporations and Steven Kaplan under Florida statutes concerning deadlocked shareholders (Case No. 82–14203 CK–Garrett, in the Circuit Court for Broward County Florida).

To protect his interests from Steven Kaplan, Casale obtained the appointment of a receiver, Steven Rackmill, a former taxi driver and friend or acquaintance of Casale. Casale's desire was to emerge from the state court litigation with his own corporation, Broward Checker Cab, Inc., essentially substituted for S & R. To that end, he, as president of Broward Checker entered into a contract with the receiver Steven Rackmill, by which Broward Checker was to purchase all of the assets of the three debtor corporations by the assumption of all liabilities of the corporations. (Plaintiff's Exhibit No. 1). The assets consisted of fixtures, equipment, furniture, automobiles and, most important, approximately thirty taxicab permits, out of five-hundred existing in Broward County. The contract between Rackmill and Casale was entered into on September 14, 1982. On October 30, 1982 Rackmill entered into a similar agreement with Robert Siedlecki, plaintiff in this adversary proceeding. (Plaintiff's Exhibit No. 2).

Plaintiff argues that Rackmill entered into the contract with him because it was apparent that Casale did not intend to close on his contract, and intended rather to ruin the company. However, the Siedlecki-Rackmill contract was made subject to the non-closing of the Casale-Rackmill contract. Casale argues that, on the contrary, he was prevented from closing on his contract because the receiver imposed additional conditions regarding escrow funds for contingent liabilities of the companies subsequent to execution of the contract, and otherwise

tried to prevent its closing. The evidence is fairly clear that Casale did not know of the Siedlecki-Rackmill contract until after it had been entered into. However, the evidence was conflicting as to whether there was an insurance crisis which led to the Siedlicki-Casale contract, and if so, whether or not it was contrived, and how much Casale knew about it. Rackmill testified that county authorities were suddenly concerned about the insufficiency of S & R's liability insurance, that Casale would not address the problem quickly enough, and that Rackmill found he could obtain much cheaper insurance through Siedlecki, which he did, with Siedlecki providing $1,500 for the insurance. While working out the insurance situation over the weekend, Rackmill also entered into the contract for sale to Siedlecki. The contract itself does not make any reference to insurance or any connection between the two transactions.

Some time during this period, Casale was able to purchase the S & R stock held by Steven Kaplan and Casale became one-hundred percent shareholder of S & R. These funds, as well as litigation funds and escrow funds for the purchase of the assets of the corporations from the receiver, totalling approximately $100,000, were obtained by Casale from Jessie Gaddis, the primary operator of taxis in Broward County. The loans are secured by mortgages on Casale's home and gas station, and Casale and Gaddis testified that Gaddis made no agreement to waive repayment under any circumstances.

When Casale perceived what he believed to be Rackmill's attempt to take the corporations away from him through a sale of the assets to Siedlecki, and now having full ownership of S & R, Casale obtained the removal of Rackmill, and attempted to dismiss the Broward County Circuit Court case which he had brought against his companies. The Broward County Circuit judge refused to permit dismissal of the case and Siedlecki and Casale were appointed co-receivers (Defendant's Exhibit D). Such an arrangement obviously could not work because the co-receivers were already fierce antagonists. Siedlecki set an emergency hearing (one of several) on his motion for contempt against Casale based on a restraining order which attorney William Blyler testified restrained only Steven Kaplan. (Few of the pleadings or orders in the circuit court case were offered into evidence in this proceeding). The motion was denied but Casale agreed to a restraining order preventing him from removing any assets of the corporation.

At that hearing, Siedlecki announced that he, as co-receiver and successor to Rackmill, intended to close on the contract with himself. Casale, as co-receiver, had not previously agreed to co-sign any of the checks signed by Siedlecki, or otherwise cooperate with him, and naturally did not agree to the sale of the assets to Siedlecki. Siedlecki and Rackmill testified that a "closing" was held on November 18, 1982 at which a closing statement was executed by Siedlecki as co-receiver-seller and as purchaser. (Plaintiff's Exhibit No. 3). No funds for performance of the contract were provided or escrowed, no bill of sale was given, and no delivery of the assets was made. Siedlecki intended to seek court approval of his sale and purchase at a court hearing on November 19, but the voluntary petition in bankruptcy was filed on that date and stayed any further court proceedings.

During the bankruptcy, insurance and dispatch services have been provided by B & L Service, Inc., a corporation owned or controlled by Jessie Gaddis. Casale and Gaddis also testified that they intend to enter into an agreement under which B & L will lease S & R's taxi permits for a set amount for one year and will provide insurance and dispatch services. (See Defendant's Exhibit C). (Casale testified that the debtor also intended to reject the Casale-Rackmill contract if the Siedlecki-Rackmill rejection was approved.)

For purposes of evaluating Casale's motives (bad faith being an issue) and the credibility of the witnesses, it should be noted that Rackmill presently does some work for Siedlecki and Casale does some work for Gaddis.

868

Turning first to the motion to reject executory contract, the court agrees with defendant that the contract with Siedlecki was clearly still executory. (The Casale-Rackmill contract is not itself at issue; the circumstances surrounding it were offered only on the issue of bad faith.) The so-called closing of the Siedlecki contract was a nullity. Plaintiff gave no evidence of a court order authorizing the sale, which alone would be dispositive, since it was receivership assets which were being sold. (The contract itself also required court approval.) Other reasons the contract was not validly closed are that it was an attempt by one-co-receiver to sell to himself; there was no actual performance by Siedlecki in his role either as buyer or seller; and the evidence is not clear that the prior contract was incapable of being closed, which was a condition to the closing of the second contract.

A trustee (or debtor-in-possession) may assume or reject any executory contract subject to the court's approval under 11 U.S.C. § 365. The court agrees with the debtor that the standard to be applied in approving or not approving a debtor's motion is the business judgment test. *In re Jackson Brewing Company,* 567 F.2d 618 (5th Cir.1978); *In re J.H. Land & Cattle Co.,* 8 B.R. 237 (Bkrtcy.W.D.Okl.1981). Although Siedlecki testified that he intended to pay all the creditors, the debtor points out that the agreement provides that a newly formed or inactive Florida corporation is to replace Siedlecki as buyer and that Siedlecki is expressly excepted from any personal liability upon the contract. On the other hand, there is no evidence to suggest that Siedlecki actually would *not* cause his corporation to pay the general creditors. Although the contract gives the buyer the right to dispute or litigate any of the listed debts, buyer would only be succeeding to S & R's rights in that regard, and creditors would be no worse off. Most important, under the contract, Siedlecki would obtain all of the assets of the corporations in return for assuming the liabilities and the debtor corporations would be left as mere shells. Given this consideration, the court cannot say that it is not within the sound business judgment of the debtor to reject the executory contract made between Rackmill and Siedlecki.

The court might decline to approve the motion to reject however if it were apparent that the motion was made in bad faith or as part of a larger fraudulent scheme, just as bad faith might be grounds for lifting the stay were that issue not mooted by a rejection of the contract. Most of the actions of Casale which plaintiff complains of either were not as serious as plaintiff argues or were actions which could equally have been motivated by a desire to keep Siedlecki out as a desire to bring Gaddis in. Regarding Casale's alleged failure to close on his contract with Rackmill, it appears that both sides were about equally at fault in not completing the process of obtaining approval by the Broward County Commission. Likewise, although Casale did not comply with the demands of Rackmill's attorney as to arrangements for contingent liabilities, plaintiff did not demonstrate that the receiver had any right to make such demands. Plaintiff did not support its allegations that Casale was financially unable to perform with any shred of evidence rebutting the testimony that $125,000 had been placed in escrow with Casale's attorney. The evidence about Casale refusing to cooperate with the receiver in obtaining insurance at the time of "crisis" was conflicting. Because no documentary evidence from the circuit court file was offered as to pertinent orders and dates, Blyler's testimony was the best evidence of whether or not Casale violated any restraining order during the receivership, and Blyler's testimony completely negated that allegation. The single unexplained act which definitely suggests bad faith was Casale's sabotaging of the operation by transferring the telephone to a different corporation of his and removing the dispatch radio. Although this was not done while a receiver was in possession and did not violate any court order, it is not consistent with the desire to keep the company operating.

Another of plaintiff's allegations to demonstrate bad faith was that the debtor's financial outlook had not been as bleak as Casale portrayed, and that Casale was really working to kill it off rather than to revive it. The testimony of Siedlecki and Rackmill tended to show that a taxicab operation was viable for these companies themselves, and that it would not be necessary to simply lease the permits to a larger operation. However, there is no question that the companies had financial problems in the past, apart from any "politically" motivated decisions Casale may have made closer to the time of bankruptcy.

If plaintiff had proven that not only were all of Casale's actions for the purpose of wresting control of the corporation in order to wrongfully give control of the cab permits to Gaddis *and* that the stated intention of the debtors as to a reorganization is a sham, so that creditors will not actually be paid, there might be grounds for denying rejection of the contract and permitting Siedlecki to proceed in state court. But there was no evidence that the stated intention of the debtors is a sham, and as it stands, there is no more reason for the bankruptcy court to be the tool for handing over control to Siedlecki than back to Casale. In the corporate in-fighting of S & R Siedlecki saw an opportunity to increase his operation. His goal had not been achieved prior to this bankruptcy however, and the process did not confer on him such vested rights that he can take precedence over the desires of the original owner of the corporation. While the issue is not resolved by a balancing of "bad faiths", the evidence did not show all the black hats to be on the Casale gang. Siedlecki admitted that he obtained the benefits of an estate asset in that he continued to receive dispatch fees from at least one driver who was utilizing an S & R cab permit subsequent to the bankruptcy. The vehicle was involved in an accident and it appears it may have been vandalized after being towed to Siedlecki's premises. Also, no explanation was given as to why certain records were not turned over by Rackmill from the time of his removal up to the date of trial.

While the court is sympathetic to the interest of consumers in having good, reliable taxi service available, decisions in a bankruptcy proceeding cannot be based on general intentions of improving the public welfare, and the decision in this case could not be made on such a basis even if the evidence had demonstrated that either the Siedlecki or Gaddis operation was superior. If the actions of Casale together with Gaddiss constitute an improper method of transferring taxi permits in violation of county ordinances, this court is likewise not the forum for the aggrieved citizen.

Debtors' motion to reject executory contract will be granted and plaintiff will be denied relief from the automatic stay. The issue of whether or not plaintiff might suffer damages as a result of the rejection of its contract was not before the court and no determination of that issue is being made.

Pursuant to B.R. 921(a), Final Judgment incorporating these Findings and Conclusions will be entered this date.